PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MARIANNE JOYCE,                    )
                                   )
              Plaintiff,           )        CASE NO.  1:13CV01224
                                   )
       v.                          )        JUDGE BENITA Y. PEARSON
                                   )
CLEVELAND CLINIC FOUNDATION,       )
*et al.*,                          )        **MEMORANDUM OF OPINION &**
                                   )        **ORDER** [Resolving ECF Nos. 25, 33, 36,
              Defendants.          )        and 37]


        Defendants Cleveland Clinic Foundation ("CCF"), Albert Kious,[1] Joanne Zeroske, and

Gloria Donnelly seeks summary judgment in their favor on Plaintiff Marianne Joyce's complaint

alleging gender and disability discrimination in violation of R.C. 4112.02(A), retaliation in

violation of R.C. 4112.02(I), and violations of the Family and Medical Leave Act, ("FMLA"), 29

U.S.C. § 2601, *et seq*.  To this end, Defendants filed the pending Motion for Summary Judgment.

ECF No. 25.  Plaintiff filed an opposition brief.  ECF No. 33.  Defendants filed a reply.  ECF No.

36.  Plaintiff has also filed a motion for leave to respond to Defendant's reply and included a

proposed response which the Court has reviewed.  ECF No. 37.  Defendants' motion is ripe for

the Court's adjudication.  For the reasons provided in this Memorandum of Opinion and Order,

the Court hereby denies Defendants' Motion for Summary Judgment as to Plaintiff's retaliation

---

        [1] Defendant Kious has been dismissed as a party to this litigation pursuant to Fed. R. Civ.
P. 41(a)(1).  ECF No. 27.

(1:13CV1224)

claim under R.C. 4112.02(I) and FMLA interference claim, and grants as to Plaintiff's remaining claims.

## I. Factual Background

Plaintiff Marianne Joyce was hired by CCF in April 2006 as the Physician Business Development Coordinator at CCF's Euclid Hospital.  ECF No. 25-2 at 4, page 11.  In her capacity as Physician Business Development Coordinator, Plaintiff was responsible for developing relationships with unaffiliated medical providers so as to encourage their references to CCF hospitals.  *Id.*  Plaintiff's office was in the Euclid Hospital, but her job responsibilities primarily required her to work outside of the hospital, at the private practice offices of area physicians.  *Id.*; ECF No. 44.  While Plaintiff was initially hired on a part-time basis, in December 2007, she approached Euclid Hospital's then-President Robert Stall about converting her position to full-time.  ECF No. 25-3 at 10, pages 102–03.  In response to her request, Plaintiff became employed full-time as a Physician Business Development Coordinator.

Prior to her employment with CCF, Plaintiff dated non-party Terrell Ford.  In 2000, Plaintiff ended her relationship with Ford.  Following their breakup, Ford engaged in a number of threatening actions against Plaintiff, her family, and friends.  Ford stalked Plaintiff and her daughter, broke a restraining order that Plaintiff had against Ford, and threatened to kill Plaintiff's friend.  ECF No. 25-3 at 26, pages 143–44.  As a result, Ford was indicted with attempted abduction and menacing by stalking on July 13, 2000.  ECF No. 33-3 ¶ 5.  Ford ultimately pleaded guilty to these charges, and consequently was terminated from the Cleveland Heights Police Department.  ECF No. 25-2 at 4–5, pages 12–13.  Since the 2000 incident, Ford

(1:13CV1224)

has not had any other criminal charges brought against him for interactions with Plaintiff or for

any other reason.  ECF No. 25-1 at 9.

Ford applied a position with CCF in 2001 as a Patient Access Representative at CCF's

Huron Hospital.  Ford indicated on his application to CCF that he was a convicted felon, but

failed to provide any details about his conviction.  ECF No 25-10 at 5, pages 15–16.  CCF hired

Ford for the position on April 30, 2001.  It is unclear whether CCF ran a criminal background

check on Ford at the time he was hired.[2]  *Id.*, page 17.  CCF later promoted Ford in November

2008 to Coordinator of Medical Staff Services, a position which required Ford to serve as an

intermediary between Huron Hospital's management and medical staff.  ECF No. 25-7 at 5, page

16.  Defendant Kious, then-President of Huron Hospital, was aware of Ford's stalking conviction

at the time of promotion, but not the attempted abduction conviction.  *Id.* at 8, page 26.  Kious

nonetheless supported Ford's promotion because Ford received positive reviews from co-workers

during the seven years he worked at CCF.  *Id.* at 14, pages 49–51.  At all times during Ford's

employment, CCF did not never received a complaint about Ford engaging in violent actions

towards women, including Plaintiff.  ECF Nos. 25-3 at 31, page 164; 25-17 ¶ 8.

From April 2006 until January 2009, Plaintiff and Ford never came into contact with each

other at work.[3]  ECF No 25-2 at 6, page 17.  In January 2009, Plaintiff learned of Ford's

---

[2]  It is not clear if an initial background check on Ford had been run at the time he was
hired and the report was not in the file, or whether a background check had never been run on
Ford.  *See, e.g.*, ECF No. 25-10 at 5, page 17 (Zeroske deposition).

[3]  Prior to her employment as Physician Business Development Coordinator, Plaintiff
testified that she had encountered Ford at the Huron Hospital when she went to Huron's

(continued...)

(1:13CV1224)

November 2008 promotion and became afraid of coming into contact with Ford at work. *Id.*, page 19. On January 28, 2009, Plaintiff spoke to Rosemary Scholti—a non-supervisory co-worker—about her prior relationship with Ford. Plaintiff emailed Scholti a copy of the court docket from the 2000 criminal case against Ford. *Id.* at 5, page 16. Scholti forwarded this email to CCF's Legal Department. ECF No. 25-3 at 38, page 193.

Upon receipt of the email from Scholti, the Legal Department commenced an investigation into Ford's hiring. ECF No. 33-5 at 7–8. Jackie Puntel, Huron Hospital Director of Human Resources, confirmed that Ford disclosed his convictions during the application process. ECF No. 25-17 ¶ 8. In 2009, Puntel also requested, for the first time, that a criminal background check be run for Ford and shared these results with the Legal Department. ECF No. 25-18 ¶ 5. Even though CCF determined that it did not need to take any adverse action concerning Ford at this time, CCF instructed Ford, in March 2009, that he was to avoid meetings in which Plaintiff was in attendance. ECF No. 25-17 ¶ 10.

In July 2009, Plaintiff had two conversations with members of CCF's management about Plaintiff's 2000 incident with Ford: first, with Euclid Hospital's Director of Human Resources, Defendant Donnelly; and second with her supervisor, then-President of Euclid Hospital Defendant Zeroske. ECF No. 25-3 at 23, pages 132–33. The parties dispute the nature of these conversations. Defendant Donnelly testified that she consulted Jackie Puntel about the results of

---

³(...continued)
emergency room to receive treatment for a cold. ECF No. 25-2 at 5, pages 14–15. Plaintiff stated that, during that emergency room visit, there had been no inappropriate interaction between Ford and herself. *Id.*

4

(1:13CV1224)

the January 2009 investigation; had a panic button installed in Plaintiff's office; gave a picture of

Ford to Rich Lowery, the Director of Euclid Hospital's security; determined that Ford had not

accessed Plaintiff's medical records; and then relayed these actions to Plaintiff.  ECF No. 25-13

at 13–14, pages 46–50.  Donnelly memorialized her actions and the conversation had with

Plaintiff in a case file.  ECF No. 25-12 at 5.  Plaintiff denies that the panic button was installed or

that Donnelly told Plaintiff about speaking to Puntel.  ECF No. 25-2 at 7–8, pages 23–25.

A few days after speaking with Donnelly, Plaintiff spoke to Zeroske, again, about Ford.

During their conversation, Zeroske asked why Plaintiff was discussing Ford with her, and

Plaintiff repeated her concerns about running into Ford.  The two characterize the tenor of the

conversation differently.  Plaintiff testified that Zeroske wanted to know why Plaintiff was

bringing up a personal matter, and that Zeroske allegedly said "I don't want to talk to you about

this."  ECF Nos. 25-2 at 8, page 26; 25-3 at 26, page 144.  Zeroske testified that she asked

because she did not understand why Plaintiff had chosen to bring the issue to Zeroske at this

time, and asked Plaintiff several times if Ford was presently doing anything to make Plaintiff feel

unsafe.  ECF No. 25-10 at 10, page 36.  Plaintiff does not deny, but cannot recall, whether

Zeroske asked whether Ford had approached Plaintiff at work.  ECF No. 25-2 at 8, page 27.

Plaintiff neither came into contact with Ford nor raised objections about CCF's responses

to her concerns to any other person in a management position at CCF for the following year.

ECF No. 25-3 at 24, page 136.  Around February 2010, Plaintiff's doctor first began to treat

Plaintiff for post-traumatic stress disorder ("PTSD").  Plaintiff testified that she may have told

5

(1:13CV1224)

her co-worker Rosemary Scholti about being "anxious," but, while being deposed, Plaintiff could

not recall having discussed the diagnosis with a supervisor.  ECF No. 25-3 at 16, page 106.

Defendants allege that Plaintiff's position as full-time Physician Business Development

Coordinator[4] was identified as one subject to an upcoming reduction in force ("RIF") in the CCF

system in late June or early July of 2010.[5]

Plaintiff's position was identified for a number of reasons.  First, the Euclid Hospital did

not have as great a need for a Physician Liaison because the majority of physicians at the Euclid

Hospital were CCF employees; thus CCF did not need a liaison to facilitate their work at Euclid.

ECF No. 35-1 ¶ 13.  Second, Plaintiff was the only employee with her responsibilities budgeted

as a full-time employee.  Id. ¶ 15.  Third, Jeanette Velez, the Liaison employed at Huron

---

[4] Throughout the record, Plaintiff's position is referred to as either Physician Business
Development Coordinator or Physician Liaison.  Plaintiff affirms that "the roles of the two
positions are not the same."  ECF No. 37-2 ¶ 5.  Zeroske testified that Jeanette Velez, the
Physician Liaison of Huron Hospital, had a "similar" position to Plaintiff, but also had additional
marketing and administrative responsibilities.  ECF No. 25-10 at 15, page 56.  Zeroske even
refers to Velez as a "business development person."  Id.  Other evidence suggests that the two
terms are interchangeable.  ECF No. 25-8 at 14, page 52.  As importantly, there is no dispute that
Plaintiff's position was identified for RIF and that Plaintiff was terminated as a result.  See ECF
No. 44 ¶ 20 ("In late October 2010, Plaintiff through her counsel was notified that her position
was going to be eliminated in connection with a Clinic-wide reduction in force.  She received a
finalized severance package on November 10, 2010, which she did not accept.")

[5] Defendants have not provided a more specific time period in which this decision
occurred.  Zeroske testified that the process was finalized in June or July, but also stated "it
wasn't something that happened fast."  Zeroske also testified that there were "many iterations" of
the list of people affected by the RIF: "So people were on the list, they were off the list.  They
were on.  It went back and forth quite a bit."  ECF No. 25-10 at 26, pages 100-01.  Donnelly
testified that, as to Plaintiff, her position was finalized for the RIF as of the second quarter.  ECF
No. 25-13 at 34, page 130.  Yet, Donnelly also testified that "the list kept changing"; Defendants
aver this is why Plaintiff was not notified when she was first selected.  Id., page 131.

6

(1:13CV1224)

Hospital, was performing marketing and other administrative responsibilities on top of her work as Physician Liaison.  *Id.* ¶ 17.  Huron serviced many of the same doctors as Euclid, so it would have been practical to consolidate the two positions into one.  *Id.*  In conjunction with the RIF, CCF selected Velez to assume Plaintiff's responsibilities at Euclid because Velez had more seniority and more advanced education than Plaintiff.  *Id.* ¶ 18.

On July 10, 2010, Plaintiff was invited to attend a physicians' event at the Mayfield Country Club.  ECF No. 25-3 at 24, pages 137–38.  The event was attended by somewhere between seventy-five and one hundred people.  ECF No. 25-2 at 10, page 34.  Plaintiff spotted Ford when she walked towards the back of the room to get food.  *Id.* at 9, page 31.  Plaintiff testified that the sight of Ford petrified her, but admits that Ford never interacted with Plaintiff during the event.  *Id.* at 10, page 33; ECF No. 25-13 at 19, page 71.

On July 22, 2010, Plaintiff emailed Donnelly about the Mayfield event.  ECF No. 25-7 at 38–39.  Plaintiff stated that Ford "was right in front of me" and that she was anxious that she would cross paths with Ford again.  *Id.*  Plaintiff also mentions her PTSD in this email.  *Id.*  Donnelly replied within fifteen minutes, asking whether there was "any kind of inappropriate interaction between [them]."[6]  *Id.* at 38.  Plaintiff replied that she and Ford did not interact, but it was still a "great source of anxiety" that she saw Ford.  *Id.*

---

[6]  After asking about any interaction, Donnelly wrote the following: "It is a small world and it is likely that you will run into him once in awhile."  ECF No. 25-7 at 38.  Plaintiff, in her Opposition Brief, quotes this "small world" language and argues Donnelly had disregarded Plaintiff's concerns.  ECF No. 33-2 at 8.  Donnelly contends that she meant that CCF would do its best to keep Ford and Plaintiff separate as much as possible, but could not guarantee that Plaintiff would never see Ford.  ECF No. 25-13 at 17, pages 62–63.

(1:13CV1224)

Plaintiff also brought her concerns about the Mayfield event to Zeroske at the end of a monthly meeting.  ECF No. 25-3 at 25, pages 140–41.  Plaintiff told Zeroske that she was worried about seeing Ford again.   Plaintiff did not, however, request Zeroske to take action about Ford.  *Id.* at 26, page 146.   Plaintiff testified that Zeroske was "short" with the Plaintiff, telling her that this wasn't an issue she wanted to discuss and that Plaintiff should take her concerns to Human Resources.  *Id.*, page 142.  Zeroske testified that she asked Plaintiff if Ford approached or menaced Plaintiff at the event, and that Plaintiff should follow up with Human Resources.  ECF No. 25-10 at 17, page 63.  Zeroske admits that she was thinking of "a million things" at the time that Plaintiff brought up the Mayfield event, but that she focused once she realized that Plaintiff was speaking about Ford.[7]  *Id.*  Unbeknownst to Zeroske, Plaintiff had taped the conversation.  ECF No. 25-3 at 25, page 141.  Plaintiff did not follow up with Human Resources after her conversation with Zeroske because "[Plaintiff] did not feel like [her] concerns were being heard."  *Id.*, page 143.

On July 28, 2010, Plaintiff filed a charge with the Ohio Civil Rights Commission ("OCRC").[8]  ECF No. 25-2 at 10, page 35.  In her charge, Plaintiff alleged that she was subject to

---

[7]  In her Opposition Brief, Plaintiff characterizes the comment as Zeroske "all but admitt[ing] that she brushed off" Plaintiff.  ECF No. 33-2 at 8.  Zeroske characterizes this encounter differently: that she did not recognize the name at first, but once Plaintiff explained, Zeroske focused on what she said.  ECF No. 25-10 at 17, page 63

[8]  Plaintiff refers to a charge filed on July 29, 2010 in her Opposition Brief.  ECF No. 33-2 at 9.  The record includes two separate charges.  ECF No. 25-12 at 17–24.  The July 28, 2010 charge is signed by both Plaintiff and an OCRC Representative, *id.* at 17, whereas the July 29, 2010 charge is only signed by the Plaintiff.  *Id.* at 18–24.  Plaintiff testified to filing her charge on July 28, not July 29, in her deposition.  ECF No. 25-2 at 10, page 35.  Also, in their notice of
(continued...)

8

(1:13CV1224)

a hostile work environment when she attended the Mayfield event in which Ford was also

present. ECF No. 25-12 at 17. Plaintiff also alleged that she was subject to retaliation for the

following reason: "The stalker works at Huron Hospital and Euclid Hospital. Although we are in

different hospitals, occasionally, we have to attend the same meetings. The stalker has not

approached me in any manner since 2001, yet I am very uncomfortable being in his presence."

*Id.* The OCRC issued a finding of No Probable Cause after an investigation, and issued Plaintiff

a right to sue letter on October 21, 2010. *Id.* at 25.

On August 8, 2010, CCF granted Plaintiff's request for FMLA leave. ECF No. 33-3 ¶ 16.

Plaintiff was initially granted leave through September 15, but Plaintiff later extended her leave

through October 2010. ECF Nos. 25-2 at 18, page 68; 33-3 ¶ 16. Around August 30, 2010,

Plaintiff discovered that Ford had been scheduled to receive computer training at the Euclid

location near her office. ECF No. 25-2 at 11, pages 38–39. On August 30, Plaintiff wrote an

email to Donnelly asking CCF to make a "good faith effort" to keep Plaintiff and Ford separated.

*Id.* at 37. The next day, Donnelly wrote a letter to Plaintiff, addressing the concerns of Plaintiff's

August 30, 2010 email. Donnelly told Plaintiff that Donnelly had learned that Ford's training

was scheduled at another hospital; that Ford was once again instructed to not go to Euclid; and

that, in the event Ford absolutely needed to go to Euclid for some reason, he was to tell Human

---

[8](...continued)
No Probable Cause, the OCRC references the charge filed on July 28, 2010. ECF No. 25-12 at
25. In any event, the difference does not appear to have an effect on the outcome of this case.
Thus, any reference to the OCRC charge herein will be to the July 28, 2010 charge.

(1:13CV1224)

Resources in advance so that Ford and Plaintiff could be kept separate. *Id.* at 38.  Plaintiff

testified she received the letter within 7 to 10 days of September 1. *Id.* at 13, page 46.

In November 2010, the RIF went into effect.  ECF No. 35-1 ¶ 13.  Plaintiff testified that

she learned of the decision in late-October through her attorney.  ECF No. 25-2 at 18, page 68.

The decision affected Plaintiff and five other employees of CCF.  ECF No. 35-1 ¶ 21.  Each

employee affected by the RIF was required to sign a general release as a condition for receiving

severance benefits.  ECF No. 25-13 at 36, page 138.  The release states in pertinent part:

> I further understand that nothing in this release generally prevents me from filing a
> charge or complaint with or from participating in an investigation or proceeding
> conducted by the EEOC, NLRB, or any other federal, state or local agency
> charged with the enforcement of any employment laws, although by signing this
> release I am waiving my right to individual relief based on claims asserted in such
> a charge or complaint.

ECF No. 25-16, at 53.  Plaintiff never signed the release, and ultimately her position was filled

by Jeanette Velez as part of CCF's plan to consolidate Liaison responsibilities for both the Euclid

and Huron Hospitals.  ECF No. 33-3 ¶¶ 18–19.

## II.  Procedural Background

Plaintiff filed this lawsuit on April 23, 2013 in the Court of Common Pleas for Cuyahoga

County.  ECF No. 1-1.  Defendants properly removed the case to federal court pursuant to 28

U.S.C. § 1446(b).  ECF No. 1.  In her Complaint, Plaintiff alleges five causes of action against

Defendants.

Plaintiff's first claim is a gender discrimination claim based on a theory of hostile work

environment, in violation of R.C. 4112.02(A).  Plaintiff alleges that Defendants created a hostile

work environment "by the fear of interaction with a man who previously attacked her" and by the

10

(1:13CV1224)

failure of CCF "to take prompt remedial measures or to take her concerns seriously." ECF No. 33-2 at 13. Specifically, Plaintiff contends that Ford's presence in the workplace was hostile to her based on her gender, and that Defendants took action that increased this hostility towards Plaintiff by retaining Ford in a position in which interaction between Plaintiff and Ford was likely. ECF No. 1-1 ¶ 25.

Plaintiff's second claim is a disability discrimination claim based on a failure to accommodate theory, also in violation of R.C 4112.02(A). ECF No. 1-1. Plaintiff alleges that she suffers from PTSD as a result of her experiences with Ford, and the fear of encountering Ford in the workplace affected major life activity at work. ECF No. 33-2 at 19. Plaintiff further alleges that she made a reasonable request for accommodation from CCF: that she needed "to be kept away from Ford in the workplace." *Id.* Plaintiff contends that she never participated in an interactive process with CCF to determine what accommodations could be made for her disability; that the failure to engage in the interactive process was the fault of CCF; and that this failure amounts to disability discrimination. *Id.* at 20–22.

Plaintiff's third claim is that she suffered disparate treatment from CCF based on her gender and her disability, in violation of R.C. 4112.02(A). ECF No. 1-1. In addition to her hostile work environment and failure to accommodate claims, Plaintiff alleges that the RIF was an adverse employment action taken on account of her gender and disability. *Id.* Plaintiff also alleges that she was treated differently than others subjected to the RIF because CCF did not alter, as to Plaintiff, its policy requiring all recipients of the severance package to release claims against CCF. ECF No. 33-2 at 11.

11

(1:13CV1224)

Plaintiff's fourth claim is that CCF retaliated against her, by subjecting her position to the RIF, because of her complaints about Ford to CCF and for filing a charge with the OCRC in violation of R.C. 4112.02(I). ECF No. 1-1. Plaintiff contends that the complaints she made to numerous employees of CCF about Ford were opposition to unlawful discrimination, and the OCRC charge were protected activity. Plaintiff alleges that "she was treated more harshly at work after she brought the matters to the attention of her supervisor." ECF No. 33-2 at 24. Plaintiff also alleges that she was treated differently by CCF because of her charge pending before the OCRC, and that the short time period between her OCRC claim and the RIF reflects CCF's retaliatory motive. *Id.*

Plaintiff's fifth and final claim is that CCF violated her rights guaranteed by the FMLA. ECF No. 1-1. Plaintiff alleges that she was entitled to take FMLA leave in October 2010, and the RIF interfered with her right to return to her position after FMLA leave. *Id.* ¶ 48. Plaintiff also alleges that the elimination of her position after she returned from FMLA leave she was entitled to amounts to retaliation. ECF No. 33-2 at 25.

### III. Legal Standard

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the

12

(1:13CV1224)

pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). To defeat the motion, the non-moving party must "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980 F.2d at 403. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact. *Id.* at 248. A fact is "material" only if its resolution will affect the outcome of the lawsuit. In determining whether a factual issue is "genuine," the court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict. *Id.* Summary judgment "will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To withstand summary

13

(1:13CV1224)

judgment, the non-movant must show sufficient evidence to create a genuine issue of material

fact.  *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990)).  The existence of a mere

scintilla of evidence in support of the non-moving party's position ordinarily is not sufficient to

defeat a motion for summary judgment.  *Id.*

## IV. <u>Discussion</u>

### A. Hostile Work Environment Claim

A plaintiff may prove that she was subject to sex-based discrimination that created a

"hostile, or offensive working environment."  *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57,

65 (1986).  In order to make out a *prima facie* case of hostile work environment, a plaintiff must

show: (1) she is a member of a protected class; (2) she was subjected to unwelcome harassment;

(3) the harassment complained of was based on sex or gender; (4) the harassment created a

hostile work environment; and (5) the employer is liable.  *Clark v. United Postal Service, Inc.*,

400 F.3d 341, 347 (6th Cir.2005).[9]  For harassment to be "based on sex," the underlying conduct

of the claim need not be overtly sexual: "[a]ny unequal treatment of an employee that would not

occur *but for* the employee's gender may . . . constitute a hostile environment."  *Williams v. Gen.*

*Motors Corp.*, 187 F.3d 553, 565 (6th Cir. 1999) (emphasis added).

Not all harassing conduct is actionable, however.  *Id.* at 562.  A court will only find a

hostile work environment when the harassment is so severe or pervasive that it alters the terms or

---

[9] Ohio courts have held that federal case-law interpreting Title VII is "generally applicable" to cases involving state anti-discrimination claims under R.C. 4112.  *E.g.*, *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332 (6th Cir. 2000); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civ. Rights Comm'n.*, 421 N.E.2d 128 (Ohio 1981).

(1:13CV1224)

conditions of the victim's employment.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)

(quoting *Meritor*, 477 U.S. at 64).  "'[T]he severe or pervasive requirement . . . reflects a unitary

concept where deficiencies in the strength of one factor may be made up by the strength in the

other.'"  *Hollar v. RJ Coffey Cup, LLC*, 505 F. Supp. 2d 439, 448 (N.D. Ohio 2007) (quoting

*Hampel v. Food Ingredients Specialties, Inc.*, 729 N.E.2d 726 (Ohio 2000)).  The Sixth Circuit

examines the totality of the circumstances in analyzing the severity or pervasiveness of the

harassing conduct, and a court should not isolate individual incidents of harassment.  *Williams*,

187 F.3d at 563 n.4 ("Each incident of harassment contributes to the context in which every other

incident occurs; the totality-of-the-circumstances test set forth in *Harris* requires consideration of

all incidents, regardless of the perpetrator, when determining the existence of a hostile work

environment.").  "Relevant circumstances include the 'frequency of the discriminatory conduct;

its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance.'"  *Cecil*, 301 Fed.

App'x. at 499 (quoting *Harris*, 510 U.S. at 23).  To be actionable, the conduct must be both

objectively and subjectively offensive based on the totality of the circumstances.  *Faragher v.

City of Boca Raton*, 524 U.S. 775, 787 (1998).

Here, Plaintiff cannot establish essential elements to her *prima facie* case for hostile

workplace discrimination.  Plaintiff has not provided evidence that demonstrates that anyone at

CCF subjected Plaintiff to unwanted or unwelcome harassment.  During her deposition, Plaintiff

conceded that Ford never sexually harassed her during her employment at CCF.  ECF No. 25-3 at

31, page 164.  Likewise, Plaintiff admitted that neither Donnelly nor Kious harassed Plaintiff.

15

(1:13CV1224)

*Id.*, pages 165–66.  Plaintiff cites one incident in which Zeroske issued Plaintiff a written warning for a dress code violation which Plaintiff says would not have occurred had Plaintiff been a man.  *Id.*, page 165.  Plaintiff could not recall any other events involving Zeroske.  The Court cannot conclude that one dress code infraction is sufficient to demonstrate that "'members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'"  *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998) (quoting *Harris*, 510 U.S. at 25 (Ginsburg, J., concurring)).

   Read in the light most favorable to Plaintiff, she appears to argue that it was Ford's presence and the *prospect of* interaction with him that creates the objectively hostile work environment based on her sex.  Even if it were assumed that Plaintiff's fear of interacting with Ford constitutes unwelcome harassment based on sex, however, she will not be able to show that the mere potential presence at work is objectively offensive to constitute a hostile work environment.  During her four and a half years working at CCF's Euclid Hospital, Plaintiff was only in Ford's presence one time: when Plaintiff saw Ford at the Mayfield Country Club in July 2010. Plaintiff, however, concedes that she did not interact with Ford at the July 2010 event beyond seeing him from across the room.  ECF No. 25-2 at 10, page 33.  Plaintiff also testified that she extended her FMLA leave because she learned that Ford was to receive computer training at the Euclid Hospital.  *Id.* at 10, page 38.  It is uncontested, however, that CCF moved Ford's training to a different hospital.  *Id.* at 13, page 46.  Neither the July 2010 event nor the computer training is sufficiently severe to counteract the infrequency with which these incidents occurred or nearly occurred.

16

(1:13CV1224)

Both incidents were troubling to the Plaintiff because of the potential for interaction for Ford, but neither involved Ford interacting with Plaintiff. Even at the July 2010 event, Ford neither touched nor spoke to Plaintiff. In this respect, Plaintiff's case contrasts with *Hollar*. In that case, the court concluded that the conduct of the plaintiff's supervisor was objectively unreasonable in light of the *Harris* factors:

> Coffey's conduct was frequent during Hollar's initial period of employment and for the six months following her promotion to day manager. The rubbing against her and the forced kiss were both physically threatening. Hollar claims that Coffey's behavior interfered with her job performance, she was always nervous and uncomfortable around him, and she missed work to avoid him. Hollar does not allege any psychological harm, but this is not essential to a finding of a hostile work environment. Last, Coffey's alleged behavior and comments were directed only at Hollar.

*Hollar*, 505 F. Supp. 2d at 449. The *Hollar* Court concluded this constituted severe or pervasive conduct, emphasizing both the frequency of the comments that Coffey made to Hollar and the intimate nature of the touching. *Id.* ("During the entire period of Hollar's employment, Coffey made numerous—not a few—offensive and intimidating remarks to her. And he did so frequently, rather than occasionally. The battery in this case involved force and more intimate touching."). In the instant case, Plaintiff concedes that Ford never harassed her while both were employed at CCF. ECF No. 25-3 at 31, page 164. Merely being in a room with Ford or the prospect of having Ford be trained near her office may be subjectively offensive to Plaintiff because of Plaintiff's fear that Ford may threaten her as he did when they dated, but that lacks the severity, frequency, or physically threatening nature of physical contact that allows the conclusion that his presence at CCF was objectively offensive.

17

(1:13CV1224)

Furthermore, two incidents over the course of twenty-three months[10] do not rise to the

level of pervasive conduct actionable in a hostile work environment action.  In *Burnett v. Tyco

Corp.*, "a single battery coupled with two merely offensive remarks over a six-month period does

not create an issue of material fact as to whether the conduct alleged was sufficiently severe to

create a hostile work environment." 203 F.3d 980, 985 (6th Cir. 1999).  Likewise, in *Black v

Zaring Homes*, the Sixth Circuit overturned a jury verdict in favor of the plaintiff in a hostile

work environment case that was based on comments regularly made at biweekly meetings over a

period of four months.  104 F.3d 822, 823–24 (6th Cir. 1997).  In the instant case, Plaintiff

alleges fewer incidents (two) spread out over a longer period of time (twenty-three months).  This

is not objectively unreasonable to allow the Court to conclude that the conduct was severe or

pervasive.  Defendants' Motion for Summary Judgment is granted as to Plaintiff's hostile work

environment claim.

### B. Failure to Accommodate Claim

An employer is liable for disability discrimination when the plaintiff shows she

"requested and was denied" a reasonable accommodation.  *Lockard v. Gen. Motors Corp.*, 52

Fed. App'x 782, 786 (6th Cir. 2002).  The Sixth Circuit analyzes a failure to accommodate claim

under the following framework.  First, the plaintiff must establish that she is disabled.  *Kleiber v.

Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007) (quoting *Hedrick v. W. Reserve Care

Sys.*, 355 F.3d 444, 452 (6th Cir. 2004)).  Next, the plaintiff must establish that she is "otherwise

---

[10]  This represents the time between January 2009 (when Plaintiff's testimony indicates that she first became concerned about coming into contact with Ford) and November 2010 (when she was affected by the RIF).  ECF No. 25-2 at 4, page 9.

18

(1:13CV1224)

qualified" for the position with the assistance of either a *proposed* reasonable accommodation or the elimination of an alleged essential job function.  *Id.* (emphasis added).  Once the plaintiff has shown these two things, the employer bears the burden of proving either that the proposed accommodation poses undue hardship to the employer or that the job function is essential.  *Id.*

The initial burden, however, is on the plaintiff to make the request for accommodation. "As the ADA demands that the employee's disability be "known" to the employer for liability to attach, a plaintiff must generally also have informed his employer of his disability and requested an accommodation prior to the time at which an employer takes adverse action against a disabled employee."  *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 204 (6th Cir. 2010) (Cole, J., concurring); *see also Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 437 (6th Cir. 1998).  Here, Plaintiff contends that her anxiety/PTSD triggered by her past relationship with Ford substantially limited her ability to do her work.  Plaintiff, however, did not report her disability until she emailed Donnelly on July 22, 2014 about having  encountered Ford at the Mayfield event.  ECF No. 25-7 at 38.  As a matter of law, Plaintiff's requests to be kept separate from Ford prior to this email cannot serve as the basis for a failure to accommodate claim because the request to be kept separate was not traceable to a disability and, therefore, outside the protections of R.C. 4112.02(A).  *See Brown v. BKW Drywall Supply, Inc.*, 305 F. Supp. 2d 814, 829 (S.D. Ohio 2004) ("This case is analogous to [*Hammon v. DHL Airways, Inc.*, 165 F.3d 441 (6th Cir. 1999)], in which the plaintiff informed his employer of his immediate problem . . . without informing the employer that the problem was traceable to a disability.").

19

(1:13CV1224)

Moreover, the Court concludes that Plaintiff did not make a request for a reasonable

accommodation, even after she brought the existence of her PTSD to the attention of somebody

within CCF. "[I]t is the plaintiff's burden to propose a reasonable accommodation." *Lockard v.*

*Gen. Motors Corp.*, 52 F. App'x 782, 786 (6th Cir. 2002). Here, Plaintiff has not met that

burden. As previously mentioned, Plaintiff's email to Donnelly was the first instance in which

Plaintiff indicated to CCF that she was suffering from PTSD. In the record before the Court,

Plaintiff has only two instances of communication with Defendants about her disability—neither

of which constitutes a proper request for a reasonable accommodation.

First, Plaintiff mentioned her PTSD to Donnelly in the July 22, 2014 email concerning

the Mayfield event. It reads in pertinent part:

> When I was at the meeting I started to get some food at a table and realized that
> Terrell Ford was right in front of me. (The man who stalked me and is now the
> head of Huron Hospital's Medical staff office.). I was sick to my stomach and am
> anxious now frequently because I'm afraid that this type of situation will occur
> more often and it triggers PTSD in me. *I just wanted to let you know since this is*
> *upsetting for me. I don't know what I can do about it and will discuss it with my*
> *therapist Monday.*

ECF No. 25-7 at 38 (emphasis added). Plaintiff did not request an accommodation for her

PTSD in that email. No reasonable jury could conclude that this email contained a request for

CCF to accommodate Plaintiff's PTSD. At best, the email can be read to mean that Defendants

should expect a future request after Plaintiff consulted her therapist. But the email does not call

Defendants to any immediate action. "The employer is not required to speculate as to the extent

of the employee's disability or the employee's need or desire for an accommodation." *Hammon,*

(1:13CV1224)

165 F.3d at 450 (quoting *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 (6th Cir. 1998)).[11]

Plaintiff next emails Donnelly on August 30, 2010, while on FMLA leave.  In her email, she requests that she needs to be kept apart from Ford in the workplace.  ECF No. 25-2 at 37.  It is uncontested, however, that Donnelly responded to Plaintiff's email the next day.  Plaintiff testified that she received Donnelly's letter within 7 to 10 days—well before Plaintiff was scheduled to return to work.  *Id.* at 13, page 46.  Moreover, the letter from Donnelly offered Plaintiff precisely what she asked for: a good faith effort to keep Plaintiff separated from Ford.  Donnelly wrote to Plaintiff and told her that Ford's computer training location had been changed; that he was told not to go to Plaintiff's hospital; that, in the event he needed to go to Plaintiff's hospital, Ford was to alert Human Resources in advance; that Ford was to avoid meetings in which Plaintiff would be in attendance; and that Plaintiff was permitted to leave any meetings in which she saw Ford without any fear of adverse employment consequences.  *Id.* at 38.  As such, Plaintiff's claim fails because she cannot show that she was denied the reasonable accommodation she requested.  *Lockard*, 52 Fed. App'x at 786.

---

[11]  Plaintiff, in her Opposition Brief, cites an Oregon district court case for the proposition that Plaintiff's email should have been sufficient to constitute a request for accommodation because an employee does not need to use "magic words" to make a request.  *Schmidt v. Safeway Inc.*, 864 F. Supp. 991, 997 (D. Or. 1994).  The *Schmidt* Court goes on to say, however: "the employee can't expect the employer to read his mind and know he secretly wanted a particular accommodation and sue the employer for not providing it.  Nor is an employer ordinarily liable for failing to accommodate a disability of which it had no knowledge."  *Id.*  This is consistent with *Hammon* and *Gantt*.  The employee must ask the employer for the accommodation.

21

(1:13CV1224)

Plaintiff argues that Defendants are liable because they could have done any number of things to prevent Plaintiff from encountering Ford in the workplace.  ECF No. 33-2 at 21.  This argument misconstrues Defendants' obligations under the law.  It is possible that CCF could have restructured Plaintiff's job or reassigned her to another position to accommodate her *had Plaintiff made such a request*.  Plaintiff did not ask Defendants for any of these accommodations.  Similar to the circumstance created by Plaintiff's July 22, 2010 email about the Mayfield event, Defendants are not required to speculate about other accommodations that Plaintiff may want, but never requested.  *Hammon*, 165 F.3d at 450.

Finally, Plaintiff argues at length that CCF is liable for the breakdown in the interactive process.  ECF No 33-2 at 20–22.  As a matter of Sixth Circuit precedent, however, "failure to engage in the interactive process is only an independent violation of the ADA if the plaintiff establishes a *prima facie* showing that [s]he *proposed* a reasonable accommodation."  *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014) (emphasis added).  An employer cannot violate the duty to engage in the interactive process without having that obligation triggered by the employee first requesting an accommodation.  To the extent that Plaintiff argues this applies prior to the August 30, 2010 email she sent to Donnelly, it is not a viable, stand-alone claim.  And, as just discussed, CCF did provide the accommodation that Plaintiff requested in her August 30 email to Donnelly.  Defendants' Motion for Summary Judgment is granted as to Plaintiff's failure to accommodate claim.

(1:13CV1224)

## C. Disparate Treatment Claims

A plaintiff may prove discriminatory motive through the use of either direct or circumstantial evidence of discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Direct evidence of discrimination is "that evidence which, if believed, requires the conclusion that unlawful discrimination was [the] motivating factor in the employer's actions . . . . It does not require the fact finder to draw any inferences to reach that conclusion." *Sharp v. Aker Plant Services Group, Inc.*, 726 F.3d 789, 798 (6th Cir. 2013) (citation omitted; internal quotations omitted). Circumstantial evidence, on the other hand, is "proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). When a plaintiff cannot prove discrimination by way of direct evidence, the three-step framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), guides the analysis of discrimination claims founded upon circumstantial evidence. *Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 725 (6th Cir. 2012); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998).

In the first step, the plaintiff must present evidence sufficient to establish a *prima face* case of discrimination. *Ercegovich*, 154 F.3d at 350. To satisfy the *prima facie* case, the plaintiff must show the following: (1) plaintiff is a member of a protected group; (2) plaintiff was subjected to an adverse employment decision; (3) plaintiff was qualified for the position; and (4) plaintiff was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably. *Geiger v. Tower Auto.*, 579 F.3d 614, 623 (6th Cir.

23

(1:13CV1224)

2009). In cases of workforce reduction, the plaintiff must also point to "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons" in order to establish the fourth element of the *prima facie* case. *Id.*

If the plaintiff establishes the *prima facie* case, the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Id.* If the employer meets this burden, the burden of production shifts back to the plaintiff to show that the employer's nondiscriminatory explanation is a pretext for discrimination. *Id.* To rebut the employer's nondiscriminatory explanation for termination and survive summary judgment, the employee must produce "sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [the employee]." *Chen v. Dow Chemical Co.,* *580 F.3d 394, 400 (6th Cir. 2009).* Plaintiff can accomplish this by proving "(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his [discharge], or (3) that they were *insufficient* to motivate discharge." *Chattman v. Toho Tenax America, Inc.*, *686 F.3d 339, 349 (6th Cir. 2012)* (emphasis in original) (internal quotations omitted).

This three-part inquiry establishes "an allocation of the burden of production and an order for the presentation of proof" in employment discrimination cases. *Cline v. Catholic Diocese of Toledo*, *206 F.3d 651, 559 (6th Cir. 2000)* (internal quotations omitted). The burden of production shifts between litigants as the analysis advances. *Provenzano v. LCI Holdings, Inc.*, *663 F.3d 806, 812 (6th Cir. 2011).* At all times, however, "the ultimate burden of persuasion

24

(1:13CV1224)

remains on the plaintiff to demonstrate that [membership in the protected class] was the 'but-for' cause of [the] employer's adverse action."  *Id.*

In their Motion for Summary Judgment, Defendants contend that Plaintiff cannot establish the fourth element of her *prima facie* case because the assignment of Plaintiff's duties to Velez does not constitute "replacement."  ECF No. 25-1 at 21.  In *Barnes v. GenCorp*, the Sixth Circuit stated:

> A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company.  An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge.  However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.  A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

896 F.2d 1457, 1465 (6th Cir. 1990); *see also Geiger*, 579 F.3d at 623.  The Court concludes that Plaintiff was not replaced and was indeed subject to a RIF.  It is undisputed that Jeanette Velez performed the same work that Plaintiff did at Huron Hospital prior to the RIF, as well as other marketing and administrative responsibilities.  ECF No. 25-10 at 15, page 56.  After the RIF, Velez was responsible for serving as Physician Liaison at Euclid—Plaintiff's old position.  ECF No. 33-3 ¶¶ 18–19.  Because Plaintiff's work was consolidated into a single position covering both Euclid and Huron Hospitals, Plaintiff was not "replaced."  Thus, Plaintiff must meet a "heightened standard" to establish the fourth element of the *prima facie* case by proffering "additional direct, circumstantial, or statistical evidence" that shows CCF singled Plaintiff out for "impermissible reasons"—here, because of Plaintiff's gender or disability.  *Geiger*, 579 F.3d at 623–24.

25

(1:13CV1224)

Plaintiff cites the general release as additional evidence of discriminatory motive on the part of CCF. Plaintiff contends that she was the only employee subject to the RIF that was required to release an active claim before the OCRC as a condition to receive her severance benefits. ECF No. 33-2 at 11. Taking this in the light most favorable to Plaintiff, the fact that she was required to allegedly waive her OCRC charge as a condition for her severance benefits is not evidence that CCF terminated Plaintiff on account of her *gender* or *disability*. If anything, it is probative of potentially retaliatory motive. *Id.* at 12 ("She was treated differently than other employees subject to the same RIF solely because she refused to release her current claims for discrimination against her employer."). But because Plaintiff has failed to offer sufficient additional evidence reflecting she was included in the RIF because of her gender or disability, Plaintiff cannot make out her *prima facie* case of disparate treatment. Defendants' Motion for Summary Judgment is granted as to Plaintiff's disparate treatment claims.

### D. Retaliation Claim Under R.C. 4112.02(I)

Plaintiff next argues that the RIF was retaliation for her "complaints to her employer about the hostile environment that was created and promoted in the workplace based on her gender and/or for her need for accommodation in light of her disability." ECF No. 1-1 ¶ 42. Like the disparate treatment claims, Plaintiff's retaliation claim is analyzed under the *McDonnell Douglas* burden-shifting framework. *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013). First, Plaintiff must establish her *prima facie* case of retaliation: (1) the plaintiff was engaged in a protected activity; (2) the defendant had knowledge of the plaintiff's protected conduct; (3) the defendant took an adverse employment action towards the plaintiff; and (4) that

(1:13CV1224)

there was a causal connection between the protected activity and the adverse employment action taken. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008).

Once Plaintiff has established the *prima facie* case, the burden of production shifts to Defendant to show a legitimate nondiscriminatory reason for the action. *Fuhr*, 710 F.3d at 674. Upon this showing, the burden of production shifts back to the Plaintiff to prove the proffered reason is pretext for retaliation. *Id.* at 675. Pretext may be shown in three distinct ways: the proffered reason had no basis in fact; the proffered reason did not actually motivate the adverse action; or the proffered reason was insufficient to motivate the adverse action. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds*, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

Defendants argue that Plaintiff cannot create a genuine issue of material fact because (1) Plaintiff was not engaged in protected activity until she filed her charge with the OCRC; and (2) the RIF decision was made prior to Plaintiff's charge, and therefore Plaintiff cannot establish a causal connection between protected activity and materially adverse employment decision. ECF No. 25-1 at 26. The Court rejects both of these arguments.

It is true that a general complaint of mistreatment in the workplace is not a protected activity when the complaint is unrelated to a statutorily protected right. *Willoughsby v. Allstate Ins. Co.*, 104 Fed. App'x. 528, 531 (6th Cir. 2004). At the same time, however, a plaintiff does engage in protected activity when she complains about allegedly unlawful activity, even if no actual unlawful activity transpired: "[t]o be a protected activity, however, the plaintiff needs to

(1:13CV1224)

have a good faith belief that [s]he is complaining about conduct that Title VII makes illegal."

*Farler v. Indus. Power Sys.*, 2013 WL 1195539, at *6 (N.D. Ohio Mar. 22, 2013) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 580 (6th Cir. 2000)).

Here, Plaintiff has filed a charge with the OCRC on July 28, 2010, alleging hostile work environment and retaliation claims based on Plaintiff's fear of interacting with Ford after his promotion, and her perception that CCF failed to adequately address her fears.  Additionally, Plaintiff raised these concerns with CCF numerous times prior to filing her charge; first, to co-worker Rosemary Scholti in January 2009, and then later to Donnelly and Zeroske on two separate occasions.  Plaintiff testified that she believed that once Scholti forwarded Plaintiff's email to Legal Department, it would be investigated.  ECF No. 33-3 ¶ 11.  That Plaintiff raised these complaints about Ford reflects that she honestly believed she was opposing illegal activity. Defendants have not presented any evidence to dispute that Plaintiff truly believed that Ford was creating a hostile work environment.  The fact that the Court concluded Plaintiff was not subjected to a hostile work environment does not affect this analysis, because "a violation of Title VII's retaliation provision can be found whether or not the challenged practice ultimately is found to be unlawful."  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579–80 (6th Cir. 2000). At a minimum, Plaintiff has created a genuine issue of material fact as to whether she was engaged in protected activity.

Defendants next argue that Plaintiff cannot establish a causal connection between Plaintiff's protected activity and the adverse employment decision.  The Sixth Circuit requires "evidence sufficient to raise the inference that [Plaintiff's] protected activity was the likely

(1:13CV1224)

reason for the adverse action" in order to satisfy the causal connection requirement.  Temporal

proximity is one indicator of causal connection.  *Spengler v. Worthington Cylinders*, 615 F.3d

481, 494 (6th Cir. 2010).  The strength of the inference raised by temporal proximity depends on

the context of the case:

> Where an adverse employment action occurs very close in time after an employer
> learns of a protected activity, such temporal proximity the events is significant
> enough to constitute evidence of a causal connection for the purposes of satisfying
> a prima facie case of retaliation.  But where some time elapses between when the
> employer learns of a protected activity and the subsequent adverse employment
> action, the employee must couple temporal proximity with other evidence of
> retaliatory conduct to establish causality.

*Zeidler*, 516 F.3d at 525 (citation omitted).  In the Sixth Circuit, a time period longer than a few

months typically will not suffice without more evidence of retaliatory conduct.  *McDermott v.*

*Cont'l Airlines, Inc.*, 339 Fed. App'x. 552, 558 (6th Cir. 2009) (noting that a jury could not infer

causation solely from a four-month period); *Zeidler*, 516 F.3d at 525 (holding causal connection

requirement satisfied solely when adverse action was taken the same day employer learns of

protected activity); *Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007) (holding temporal

proximity "does not exist" when a multi-year period exists between protected conduct and

adverse action); *DiCarlo v. Potter*, 358 F.3d 408, 421–22 (6th Cir. 2004) (holding that a twenty-

one day period is sufficient to establish causation without additional evidence); *Hafford v.*

*Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (stating that "two to five months" renders the

inference of causation "tenuous" without additional evidence).

Plaintiff argues the retaliation was due to the fact Plaintiff brought complaints about her

interaction with Ford to CCF.  ECF No. 33-2 at 22.  Defendants argue that there is no causal

29

(1:13CV1224)

connection because the decision was finalized prior to the time that Plaintiff filed her charge with the OCRC.  ECF No. 25-1 at 26.  As discussed above, however, that is not the only protected activity that Plaintiff had engaged in.  Her complaints to CCF about her fear of encountering Ford constitutes a good faith complaint about what Plaintiff believed was a hostile work environment.  Moreover, the timing of the decision to include Plaintiff's position in the RIF is not as clear as Defendants insist; Zeroske and Donnelly are inconsistent in their testimony as to exactly when Plaintiff's position was finalized for the RIF.  *See supra* note 4.  Both testified that the list constantly changed from the moment the budgetary process began until the November announcement of the RIF.  ECF Nos. 25-10 at 26, pages 100-01; 25-13 at 34, page 130.  A reasonable jury could conclude that Plaintiff's position was not finalized until after Plaintiff filed the OCRC charge—the last in a series of escalating steps Plaintiff took to have her concerns about Ford addressed by CCF including her January 2009 conversation with Scholti, the July 2009 conversations with Zeroske and Donnelly, and the July 2010 email sent to Donnelly following the Mayfield event.

Furthermore, Plaintiff bolsters her *prima facie* case with additional evidence of retaliation that a reasonable jury could conclude establishes causation.  First, Plaintiff testified that she perceived Zeroske and Donnelly as disregarding her concerns when Plaintiff conversed with them in July 2009.  Second, Plaintiff testified that Zeroske was short with her when Plaintiff told Zeroske about the Mayfied event.  Defendants dispute Plaintiff's characterization of these conversations, but at the summary judgment stage the Court must construe the evidence in the light most favorable to Plaintiff; consequently, there is at least a dispute as to how CCF

30

(1:13CV1224)

responded to Plaintiff's concerns.  Next, Plaintiff asserts that she was improperly reprimanded

for a dress code violation by Zeroske.  ECF Nos. 25-3 at 32, page 169; 33-2 at 23 n.53.  Also,

Plaintiff alleges that Zeroske told her that a report she submitted was "fine" and then had some

other employee review it.  *Id.*, pages 169–71.  If accepted as true, the above evidence has a

tendency of showing that CCF was becoming increasingly impatient with Plaintiff as she

continued to raise concerns about Ford, and that her supervisor may have begun to negatively

view Plaintiff's work performance.  Coupled with temporal proximity, the Court concludes the

evidence creates at a minimum a genuine issue of material fact as to whether there was a causal

connection between Plaintiff's complaints to CCF about Ford and her selection for the RIF.

        The burden shifts to Defendants to articulate a legitimate nondiscriminatory reason for its

decision to include Plaintiff's position in the RIF.  *Fuhr*, 710 F.3d at 674.  Here, Defendants have

met that burden.  Donnelly's affidavit articulates a list of permissible reasons why Plaintiff's

position was selected for RIF; specifically, Euclid Hospital had a reduced need for a Physician

Liaison, Plaintiff was the only full-time Physician Liaison within CCF, and Velez could perform

the Liaison responsibilities for both Huron and Euclid Hospitals.  ECF No. 35-1.

        Thus, to survive summary judgment, Plaintiff must produce sufficient evidence to permit

a jury to conclude that CCF's stated reason is pretext for retaliation.  *Fuhr*, 710 F.3d at 675.  In

determining whether the Plaintiff has met this burden, the Court can consider the evidence used

in "establishing the plaintiff's *prima facie* case 'and inferences properly drawn therefrom,'" as

the trier of fact may ultimately rely upon this evidence as well.  *Reeves*, 530 U.S. at 143 (quoting

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.10 (1981)).

(1:13CV1224)

The Court concludes that Plaintiff has presented sufficient evidence to allow a jury to conclude that CCF's proffered reason for selecting her position for RIF was not the actual reason *she* was selected. In addition to the evidence discussed above, Plaintiff presents evidence that she was not the highest paid employee in that position. In CCF's own words, Velez was earning "substantially more" than the rest of the employees with similar responsibilities, including Plaintiff; Velez was paid over $15,000 more than Plaintiff ~~was~~. ECF No. 25-12 at 48. Furthermore, Zeroske testified that Velez was only doing Liaison work for one-third of the time. ECF No. 25-10 at 15, page 56. Furthermore, Plaintiff affirms that she was close to completing a Masters in Business Administration, a degree that would directly benefit her responsibilities as Physician Liaison. ECF No. 33-3 ¶ 19. Most damaging is an email sent by Jackie Puntel concerning Velez's salary. It states that CCF was looking to situate Velez's other job responsibilities with another employee. ECF No. 25-12 at 47. This email directly contradicts CCF's assertion that Plaintiff's position was eliminated because another employee was performing Plaintiff's job on top of other responsibilities; if Velez was to perform Plaintiff's identical job responsibilities after the RIF, at a higher salary, why was Plaintiff's position "ripe for elimination?" Taken together, the evidence could allow the trier of fact to conclude that CCF eliminated a position that (1) came with a lower salary; (2) was held by a person dedicated full-time to performing Liaison work rather than one-third of the time; and (3) was held by a person arguably more qualified for the work.

Defendants cite a number of cases which they argue stand for the proposition that an employer's business decision cannot be questioned as a means of demonstrating pretext. Each

32

(1:13CV1224)

case is distinguishable however.  The plaintiff in *Godby v. Marsh USA., Inc.*, 346 Fed. App'x. 491, 494 (11th Cir. 2009) drew a higher salary than the employee that replaced him.  The *Godby* Court noted that it was consistent with the goals of the RIF to eliminate the position with the higher salary.  Here, however, the fact that Plaintiff was paid less than her replacement is probative of the fact that business decisions might not have been the actual reason her position was eliminated.  In any event, *Godby* is not controlling precedent.[12]  *Ortega v. Cosmair, Inc.*, 1993 WL 185183 (6th Cir. May 28, 1993) is controlling; however, *Ortega* has been interpreted as applying in cases in which questioning the wisdom of the business decision was the sole piece of evidence of pretext and not foreclosing questioning the business judgment altogether.  *See* *Hoover v. Allstate Ins. Co.*, 2013 WL 4517888, at *7 (N.D. Ohio Aug. 22, 2013) ("It is possible a reasonable jury can call into question the decision of the employer because the perceived lack of merit and genuineness of the decision.  Plaintiff must offer "ample" evidence to show the decision of the employer lacked merit and genuineness.") (quoting *Zeidler*, 516 F.3d at 526–27); *Snyder v. Pierre's French Ice Cream Co.*, 2013 WL 641477, at *3 (N.D. Ohio Feb. 21, 2013) ("The Sixth Circuit, however, has made clear that a plaintiff cannot demonstrate pretext merely by second-guessing a defendant's business decisions").

A jury could conclude that CCF's reason for eliminating Plaintiff's position in the RIF was pretextual for retaliation.  Thus, the Court concludes that Plaintiff has created a genuine

---

[12]  In both their Motion for Summary Judgment and their Reply, Defendants represented this case as controlling precedent from the Sixth Circuit.  ECF Nos. 25-1 at 4, 23; 36 at 14.

(1:13CV1224)

issue of material fact as to the issue of pretext.  As such, Defendants' Motion for Summary

Judgment is denied as to Plaintiff's retaliation claim under R.C. 4112.02(I).

### E. FMLA Claims

In her Complaint, Plaintiff alleges both a FMLA interference claim, in violation of 29

U.S.C. § 2615(a)(1), and a FMLA retaliation claim, in violation of 29 U.S.C. § 2615(a)(2).  ECF

No. 1-1 ¶¶ 49, 53.  The *McDonnell Douglas* framework for analysis applies to both interference

and retaliation claims.  *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012).

### 1. FMLA Interference

"It is unlawful for employers to 'interfere with, restrain or deny the exercise of or attempt

to exercise, any [FMLA] right provided.'" *Grace v. USCAR*, 521 F.3d 655, 669 (6th Cir. 2008)

(quoting 29 U.S.C. § 2615(a)(1)).  To make out the *prima facie* case of FMLA interference, a

plaintiff must prove the following: (1) plaintiff was an eligible employee; (2) the defendant was

an employer as defined under the FMLA; (3) plaintiff was entitled to leave under the FMLA; (4)

plaintiff gave the employer notice of her intention to take leave; and (5) the employer denied the

employee FMLA benefits to which she was entitled.  *Edgar v. JAC Prods.*, 443 F.3d 501, 507

(6th Cir. 2006).  Defendants admit that Plaintiff has satisfied the first four elements of the *prima*

*facie* case.  ECF No. 25-1 at 29 n.19.

The Court concludes that the Plaintiff has created a genuine issue of material fact as to

whether CCF denied Plaintiff reinstatement that she was entitled to. "An employee has no greater

right to reinstatement or to other benefits and conditions of employment than if the employee had

been continuously employed during the FMLA leave period."  29 C.F.R. § 825.216; *see also*

34

(1:13CV1224)

*Madry v. Gib. Nat'l Corp.*, 526 Fed. App'x. 593, 596 (6th Cir. 2013); *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003).  Defendants argue that Plaintiff is not entitled to reinstatement because her position was selected for elimination apart from the FMLA leave Plaintiff took.  Plaintiff, however, has created a genuine issue of material fact as to whether her selection for the RIF was unlawful.  It is obvious that an employee not exercising rights under the FMLA enjoys protection from termination based on an illegal reason.  *See, e.g.*, R.C. 4112.02(I).  The right to not have one's job eliminated because of discriminatory conduct, therefore, is a "right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."  29 U.S.C.A. § 2614(a)(3)(B).  Consequently, Plaintiff's entitlement to reinstatement following her FMLA leave is contingent on the material dispute over whether she was terminated for impermissible reasons: if she was selected for the RIF as retaliation for her complaints about Ford and her OCRC charge, then CCF would have interfered with her FMLA right to reinstatement following leave and Plaintiff would thus be entitled to compensation.

Based on the foregoing, Plaintiff has established a *prima facie* case for FMLA interference.  Defendants offer the same legitimate nondiscriminatory reason for Plaintiff's FMLA claim as they do to rebut Plaintiff's retaliation claim.  As discussed above, however, the Court concluded that Plaintiff has offered sufficient evidence that Defendants' reason was pretextual in order to survive summary judgment on her retaliation claim.  The Court likewise concludes there is sufficient evidence to demonstrate pretext as to Plaintiff's FMLA interference claim.  Because there remains a material dispute as to whether Plaintiff was entitled to

(1:13CV1224)

reinstatement following her FMLA leave, Defendants' Motion for Summary Judgment is denied as to Plaintiff's FMLA interference claim.

### 2. FMLA Retaliation

The FMLA also prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by [the FMLA]". 29 U.S.C. § 2615(a)(2). A plaintiff must establish the following to make out a claim of retaliation under the FMLA: (1) plaintiff was engaged in an activity protected by the FMLA; (2) the employer knew that the plaintiff was exercising his or her rights under the FMLA; (3) after learning of the exercise of FMLA rights, the employer took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Donald*, 667 F.3d at 761.

Here, Plaintiff cannot establish a causal connection between the exercise of her FMLA rights and the RIF. *Blosser v. AK Steel Corp.*, 2012 WL 3112307 (S.D. Ohio, July 31, 2012), *affirmed* 520 Fed. App'x. 359 (6th Cir. 2013), is instructive. In *Blosser*, the plaintiff was unable to establish a causal connection relying on temporal proximity because four months passed between the plaintiff's request for FMLA leave and selection for layoff in the RIF. *Id.* at *7. At the time of the RIF, plaintiff and over 100 other employees lost their positions. *Id.* Furthermore, the *Blosser* Court observed that the employer "freely granted the [plaintiff] all the leave he requested." *Id.* Finally, the court rejected the plaintiff's attempt to bolster his case by the use of "two innocuous comments allegedly made by a supervisor." *Id.*

36

(1:13CV1224)

In the instant case, Plaintiff will likewise not be able to establish a causal connection. First, like in *Blosser*, Plaintiff was not the only CCF employee subjected to the RIF.  Second, Plaintiff cannot rely on temporal proximity at all because the RIF decision was finalized before Plaintiff commenced FMLA leave.  Third, Plaintiff admits she was given all the FMLA leave she requested from CCF.  ECF No. 25-3 at 30, pages 161–62.  Finally, and perhaps most importantly, Plaintiff herself does not believe her position was eliminated because of the fact she took FMLA leave.  *Id.* at 30–31, pages 163–64.  Defendants' Motion for Summary Judgment is granted as to Plaintiff's FMLA retaliation claim.

### V. Conclusion

For the foregoing reasons, the Court hereby denies Defendants' Motion for Summary Judgment as to Plaintiff's retaliation and FMLA interference claim, and grants as to the rest of Plaintiff's claims.  Having considered Plaintiff's Response to Defendant's Reply and Newly Filed Affidavit, the Court denies Plaintiff's motion for leave to file a surreply (ECF No. 37) as moot.

IT IS SO ORDERED.

 September 29, 2014                         /s/ Benita Y. Pearson
Date                                       Benita Y. Pearson
                                           United States District Judge

37